Next case this morning, United States v. Zayas, I believe, which is 22-2054. Counsel for Collins, if you would make your appearance and proceed, please. Good morning. Mary Stillinger v. Sophia Zayas. May it please the court? I would hope to reserve five minutes for my rebuttal. We'll see how this goes. Your Honors, Anneliese Zayas died on October 22, 2007. She was two months old. The experts disagreed about what caused her injuries. The experts disagreed about what caused her death. There was no allegation of what conduct Ms. Zayas engaged in that could have caused any of the injuries or the death. The indictment alleged injuries. It did not allege conduct. There was a motion to the Bill of Particulars asking that the government allege conduct, and that was denied. The court said it was sufficient to allege the injuries. You said the experts disagreed about what caused the death. The experts did not, at least I thought, they did not disagree that it was not an accidental death. There were double negatives there. The experts were of the uniform opinion that it was not an accidental death, right? Actually, not correct. I mean, it's really complicated, but let me try to sum it up this way. Simplify it for me. Sure. The experts agreed that the death was due to an axonal injury in her brain, meaning there was something that happened to her brain. There were two different ways that could have occurred, either through trauma or through a hypoxic event, which is a lack of oxygen. So there are different ways to determine whether it was caused by trauma or a lack of oxygen. The defense expert said his opinion was, based on the injuries to her head, that that could not have caused trauma. Therefore, he believed it was a hypoxic event, meaning lack of oxygen. She was laid on her stomach when she went to sleep after having been given a bottle. Well, we're looking at the evidence in a light most favorable to the government now. You're here on a sufficiency challenge. So my understanding of the medical examiner's testimony is quite different from what you were just reciting. That is correct. I actually did not intend to go down that path, except that the judge asked if the experts were unanimous on that point, and they were not. So there were some injuries, Your Honor, and this is perhaps what you're thinking of. It was unanimous that this baby suffered abuse. It was not unanimous that abuse caused the death. Well, that is a helpful clarification, and that's a good way for us to begin, then. All right, if there was unanimity on the abuse front, then help us to understand why there was not sufficient evidence for any rational juror to conclude that your client did it. Sure, Your Honor. So the government's theory was sort of one of exclusion, I would say. They had the injury, someone did it, and I would say again that that applies to the injuries. There was a wrist that was fractured that everybody agreed was caused by some abuse. There were rib fractures caused by some abuse. Viewing the evidence in light most favorable to the government, there was head injuries that were the result of abuse. So there's an injury, somebody did it. Ms. Zayas was the most likely suspect, essentially. It was a theory of exclusion. I would say that when there is a tragic death like this, the courts have to be very careful to make sure there is sufficient evidence. The theory of exclusion works in some cases, and there are a number of cases cited by the government where there are no witnesses. They have an injury, they have a person, they say that's enough. One of the cases cited by the government repeatedly is State of New Mexico v. Galindo. That case involved a small child who was sexually assaulted to the point that she was killed. There was one person, one adult male in the house. That is not this case. United States v. Christie, that was a small child who died of dehydration because her mother was playing video games. Could I ask you to focus right now on the counts one and two, which are the first is the murder, second degree murder count, and the second is the intentional child abuse resulting in death. Yes, ma'am. Would you agree that the evidence that the government had was stronger as pointing towards Ms. Zayas on those two counts than the other six counts, which were all various counts of intentional child abuse that she was convicted of? No. Well, let me ask. I didn't see your brief making this distinction, but I'm a little confused because my understanding of what the cause of death was, according to the government's expert, was that it occurred within two to three hours of the child's death. That's correct. And that's really important, isn't it? Yes. Because wasn't there testimony that Mrs. Zayas was the caretaker that afternoon? Nobody really contested that. She made several statements. Timing was a little different in some of her statements, but she said, I was the caretaker. I put the child, I fed the child. I put the child down for a nap. I'm the one who checked on the child a couple hours later. Correct. The child is not breathing. Correct. So we actually have Mrs. Zayas as the caretaker of the child in the two- to three-hour period that we know that the death was, in that period, from a particular cause, either a shaken baby-type cause or potentially it's blunt trauma injuries to the brain, according to the medical expert. So don't we have better evidence or more specific evidence as to causation on counts one and two than we do on four, six, eight, 10, 12, and 14, which are all child abuse at varying times? We have fractures, lesions, radius and ulna fractures, older rib fractures, newer rib fractures, and skull fractures that didn't cause the death, according to the clinical expert. I really appreciate the detail that you put into understanding that. Well, I didn't see that detail in your brief, and it was a little bit troubling because I think each of these counts, you've asked us to judge each of these counts on a sufficiency basis. And so I'm asking you, what was there, for instance, on counts? Wasn't it different on counts one and two? Wasn't there more evidence? Well, so, Your Honor, I don't think so, and here's why. I think that you're right. The experts all agree. That is one thing the experts all agreed on is the injury had to have occurred within several hours of death, whether it was just a lack of oxygen or whether one of the governance experts said shaken baby, one of the governance experts said not shaken baby but a blunt force trauma, and then our experts said more likely a lack of oxygen, in any event, several hours beforehand. The jury did hear evidence on counts one and two that the death, they did hear evidence that the death was resulting from injuries that must have occurred within two to three hours of the death. They heard that evidence in a light most favorable to government. We have that, and we have her as the caretaker. Well, yes, but being a caretaker is different than being the sole person that had access to a child. I understand. There were three adult caretakers in that house. There was Mr. Zayas, Mrs. Zayas, and then there was the grandma, Marva Reed, who specifically had traveled to Alamogordo to care for this baby because Sophia Zayas was having troubles with the 2-year-old and the newborn. So there were three adults that day. The evidence was all three of them were in the house all day that day. I know Mrs. Zayas said I was the caretaker. She did give her the bottle the half hour or so before she found her not breathing. Mrs. Zayas not only said she was the caretaker, but in her interviews, didn't she exclude the other two saying they weren't capable of this, of committing that abuse? She did. All right. Well, then she did her own process of elimination in leaving her as the lone person standing. Well, but she also said on other occasions. I mean, her initial reaction was they couldn't have done this because she was being questioned about how did this happen. They couldn't have done this. She also said I didn't do anything. I mean, she didn't. That was not a confession. The government says that several times as though that were a confession. She excluded them. There's another time, Your Honor, where Peter Zayas tells her this is a surreptitiously recorded conversation. He says I did it. I hurt Annalisa. And Sophia Zayas says to him you're a liar. You didn't. You're a liar. Doesn't that favor the government's case? Because she's saying Mr. Zayas didn't do it. She's saying it to him. No, you didn't do it. You're a liar. It doesn't exclude her. It excludes him. Well, it shows her sincere belief that he was not capable of that. That was her sincere belief. Why is that favoring her at this point? Why is it excluding him as she did in the very first instance when she gave her statement saying it couldn't have been my mother or Mr. Zayas? Grandmother, but yes. Her mother, yeah. No, actually it was Sophia's grandmother. Oh, Sophia's grandmother. I'm sorry. It was Annalisa's great-grandmother. Sorry, yeah. But she was fairly young still. But, Your Honor, there was still a third person there. And her belief that it was not one of the other two, I mean if we're going to credit her belief it was not one of those two, why wouldn't we also equally credit her belief that she didn't do anything? Because in evidence law, one expects people to exculpate themselves. That's very different from eliminating other people and leaving yourself standing. So, I mean, the logical inference of how people operate is, yes, you will say I didn't do it, but that doesn't mean you will also eliminate the other two people who could have done it. Leaving yourself the lone person making the statement, which we would expect many people to make, that I didn't do it. I mean, in terms of if you're looking at how a rational jury, and that's what we're in that game, how any rational jury would view this, it seems that they would likely say you would operate like other people in the human condition who would be inclined to exculpate themselves, but not perhaps also eliminate the other two people who could have done it. In that same interview, she did exculpate herself. But I also think if you said if there was a room with three people, I'm like, I don't think they did anything. If I'm inculpating myself, I would also say, and I did do it. I mean, that's a confession. That's the next step. If I am actually saying they didn't, I just don't think you can infer that that's a confession. And that's basically what the government is saying. You can infer a confession from that. Because she said I don't think either one of them did it. We are inferring a confession? Okay. I will spot for the present purposes that point, that it was not a confession. But the issue, going back to what we've been talking about, is process of elimination. I mean, the reality is she's eliminating the other two people, and then a jury's got to decide, well, who's the only other person present? Who's the only other person who is her primary caretaker by her own admission?  It is a process of elimination. But what I'm saying, those other cases we're talking about, there was one person. There was one person in Galindo. There was one person in Christie. There's one person, I'm not sure how to pronounce the other case I'm talking about. Ballo? I was actually going to say Montoya. State versus Montoya. There was one person there, Your Honor. I think a more apt case is Consul. It's also a state court case, Consul. And this is the case where the gentleman, I think it was the uncle of the baby, swaddled the baby too tightly. The state had the theory that the baby had been suffocated by the over-swaddling and laid the baby on its face as well. When the medical expert said, no, that wouldn't cause that kind of suffocation, the state shifted and said, well, then we think it was intentional suffocation. And what the court said there, and I mean, it's a state court, but sufficiency is sufficiency, I think. It's the same review. They said whether this expert testimony alone, testimony in this case based solely on a deduction from an absence of other causes that a certain event likely occurred, the issue is whether that's sufficient to support a criminal conviction. They said a jury must have a sufficient evidentiary basis to conclude the defendant actually committed the crime that he's accused of, not that it is among a range of possibilities, not that other people can't be ruled out. And I think that's what happened here. They said she's most likely. There was no ruling out, and I agree, the only thing there is to rule out Marva Reed, the grandmother, is Sophia's first, I'm sorry, Ms. Zayas' first exclamation, my grandmother wouldn't have done that. But your operative, the operative word that I take from your reading of console is alone, expert testimony alone. Well, that's what the court harped on in that case, that all you had was a bunch of expert testimony on that matter and a shifting of the government theory. That's not what you have here, is it? You've got a historical pattern of what is deemed to be abuse, granted not necessarily by your client, but somebody abused her, and then you've got, so you have a number of other things going on here that were not present in console, right? Well, you do have, and Peter Zayas had confessed to doing that for 14 years. He had taken responsibility for those other injuries. Which the wife, the one who's behind bars, says he couldn't have done it, right? Right. That was her belief. That was her belief. I do have two other issues, which is the severance and the continuance, and I see I'm running short on time. I think this was set at 15 minutes. It is set at 15 minutes. Okay, so I think I'd best sit down so I can reserve a little bit of time for rebuttal. If you can start, if you want to, we'll give you some time. Go ahead. Well, I appreciate that, Your Honor. I just want to talk about the severance for a minute, and the severance was not of defendants. It was of counts. We have 15 counts that allege physical abuse of Annalicia. The type of evidence on that, the time frame of the evidence on that, which is the two months of her life, is very different in nature than Count 16, which alleged abuse of Anaya, the older daughter. That was, and we had a bill of particulars on that because we never could figure out how it alleged an offense, honestly. At the end of the day, it really didn't, and the judge granted Rule 29 motion on Count 16. But it was very different in nature. What it did is it allowed the government to go into, as you said, a background of bad mothering, a background of being drunk, smoking cigarettes in the house. That all came in as part of the Count 16 allegation. Wasn't the drunkenness and the smoking cigarettes in the house also came in as relevant to the time period within the two months that the child lived, the second child? Yes. No, it would have. It would have with that. It's just we wouldn't have gotten into two years of it. Yes. No, that is true, and that's fair. It's a prejudice factor in terms of the amount of evidence that came out. My issue with respect to both of my other issues, the severance and the continuance, are that Judge Brack simply did not do the balancing test to show that he did not abuse his discretion. He just said, so we were alleging a misjoinder under Rule 8, and in the alternative, even if you thought they were properly joined, the prejudice was so severe. The balancing test, of course, is supposed to do, I mean, when you're weighing out, is there expense and convenience to two trials? There were different witnesses. For the most part, there were a couple of witnesses that testified about both children, but all the medical testimony about Anaricia was one trial. There would have been a few witnesses. I mean, honestly, they wouldn't have gone forward on the second one because they didn't really have evidence on it. But there were only a few witnesses as to the older daughter, Anaya. He never went through that balancing test. He just said, it's child abuse. He said the timeframe substantially overlapped, which they didn't because Anaricia was only alive for two months, and there were no incidents of abuse of Anaya in that time period. With respect to the continuance, I know that is probably my weakest argument, but I still wanted to raise it because I think it's significant, again, because Judge Brack— We're going to give you some rebuttal, but keep it short. Thank you. No, I'll keep it very short. My issue with that, Your Honor, is just Judge Brack said in January of 21, come hell or high water, we're going to go to trial in June. There were some issues about why we couldn't. He had some health issues. But he was very, very clear, no matter what, we're not going to trial. I mean, I'm not going to grant a continuance. I'm not going to consider it. And that is what happened, Your Honor. Well, counsel cannot be timid. And irrespective of what the judge said, it's counsel's obligation to preserve an objection, right? I mean, even if you're going to trial and ended up going to trial in July, you had to at some point say, I'm preserving my objection that July is not okay. That was never done, right? Your Honor, you are correct to an extent. What I said, I was trying to get the continuance. When he denied it, I said, I made it clear what I wanted. He denied it. And so perhaps under Rule 52, I preserved it. But I did say, but I'm always respectful of the court's settings, so we will be ready to go July 26th, Your Honor. Yes. That is what I said. And it could be that I am too polite sometimes. I don't have a problem with you saying that I'll be ready to go. What I have a problem with is that no point thereafter was it clear that you were preserving that objection. I understand, Your Honor. Okay. Thank you. And I'll open up a little bit of it. You will. Thank you. Good morning, Your Honor. Your Honor, may it please the court, counsel, Paige Messick for the United States. This case is about the tragic death of a battered baby. But it's also at another level about respect for the entity in our justice system that is entrusted with the task of weighing conflicting evidence, judging credibility, and ultimately rendering a verdict of guilt or innocence. This jury in this case had more than enough evidence to support its conclusion that Sophia Zayas was guilty of the murder and the intentional abuse of her two-month-old daughter, Analicia Zayas. The injuries that Analicia suffered were so varied and so severe that they simply could not be accidental. And, in fact, the experts agreed that they were not accidental. The question then becomes, who inflicted them? And this jury had plentiful evidence here to point to Ms. Zayas as the person who inflicted those injuries. First, it heard from her husband, Peter. He testified that he did not inflict the injuries. You mean the same Peter who later wanted to take the fall for it and say he did do it? Yes, yes, the same Peter. Yes, okay. Of course. But the jury heard that. All of that was before the jury. They're entitled to believe him. He's not incredible as a matter of law. The jury is entitled to hear his explanation that he loved his wife, he was trying to protect his wife, and eventually he realized he needed to protect his children instead. The jury found that credible. He testified he didn't do it. So that excludes him. Sophia herself. Excuse me. Stop, stop. I exclude him for what? Counts 1, 2, 4, 6, 8, 10, 12, 14. They're all at different times except for the first two are the deaths. There's a pattern. What does it exclude him for? He says I didn't. It excludes him from all. He says I never inflicted those injuries, any of the injuries. I inflicted no injuries on my daughter. So it's not possible for the jury to think that maybe, even though he didn't cause the death, maybe he caused, for instance, the skull fractures that he gave them a specific story about and said she was on the air mattress, and I was trying to get some desiccant ointment, and I put my foot, and she fell off. Maybe that explains the skull fractures. What do we have on 4, 6, 8, 10, 12, and 14? We don't have any expert testimony as to exactly when those occurred. We don't have any testimony from anyone as to who was present or who would have been the caretaker on whatever dates those occurred. We've got something on the death, I understand, because we've got her as caretaker. We've got something. But what do we have? We can't group every single count together. Can we just assume that she's guilty of all of those other counts when other people were present for a two-month period because she's potentially guilty of one and two? There was a lot in your question, Judge Moritz. I know, but that's the part I want to focus on, is how are you pulling all these counts in with counts one and two? You're talking about the death, but you don't talk about how we can pull her in on everything else. Okay, well, let's start again with the basics. There are three adults in the house. Peter Zayas testifies. Are we talking about the day of the death now? Are we talking about these other instances? I'm talking about Peter Zayas' testimony, that he did not inflict any of these injuries on his daughter, that every time he took responsibility for an injury, that was a lie. So he can be excluded as a suspect in any of the injuries. He also never, I would just say as an aside, he never took responsibility for the cigarette burns. He could be excluded. The jury also could have thought that perhaps he was lying. The jury could have decided to disbelieve him, but the jury did not decide to disbelieve him. What did the jury have on those other counts? The jury first has his testimony. I got that. First, got his testimony. It also has Sophia's exclusion of Peter and of the grandmother, Marva, as a suspect in any of these injuries. She says they are incapable of doing that. And she also says she didn't do it. She says she didn't do it, but again, the jury can expect that that's a false exculpatory statement, but that when she's going this extra step to say, oh, they didn't do it either, that that's something they can credit. So they've got that. She even said in her closing argument, I'm not suggesting it's Marva. I'm not asking you to look at her. I don't think that she's a good suspect. The jury can take this, take her at her word. So she has excluded the other people in the house. Well, the trouble is there was no testimony about these other many acts of child abuse. There was no testimony at all about any details as to when they might occur, how they might have occurred, who was there when they occurred. The only thing we've got is the day of the death. We've got some specific testimony. I agree that the testimony. Can you point me to a case where it's enough that we have some specific testimony as about the day of death and the injuries that occurred within two to three hours, but we've got nothing specific at all except general denials, which is what you're talking about. Well, I would say we do have very strong evidence that she is the person that caused the fatal injuries. But you can't completely divorce that from the other injuries. There was a pattern of abuse here. This child suffered ten rib fractures, two broken bones in the arm, what appeared to be four cigarette burns at different times, six rib fractures also at different times, two different skull fractures that were very unlikely to have been caused in the same incident. Very unlikely to have been caused. I get all that. I'm just saying what was there about those other. I think it is not unreasonable to say there are probably not multiple people who are abusing the child in this way. Well, interestingly, we have Mr. Zayas who at one time said he did it all, and he also pled guilty to endangerment. He did. So it isn't beyond at all reasonable to think that the jury might have questioned 4, 6, 8, 10, 12, 14. Those counts. A jury hearing this could question his testimony, but this jury accepted his testimony. And this jury was not unreasonable in doing so. So it's okay beyond a reasonable doubt we can convict her not just of the death of this child, but of numerous injuries over the child's life with nothing other than Mr. Zayas who has said, I did this, saying, no, I didn't do it after all. That's all we got. No, we don't only have that.  We also have Sophia being extremely evasive in her interview about how her daughter received these injuries. We have two different people saying that she seemed like she was feigning emotion or that she was manipulative during the interview. Again, we're talking about beyond a reasonable doubt here. But I'm saying these are reasons to point to Sophia. We've already established that these are intentional injuries and that there was a pattern of intentional injuries. We also have testimony that Sophia was an alcoholic who was, quote, barely sober during the two months of her daughter's life and who was violent and, quote, very dangerous when she was drunk. So these are things that this jury. We also have Mr. Zayas saying she was violent, but he never, ever saw her harm the children. And, in fact, he didn't, even though he ultimately said basically it must have been Mrs. Zayas, he didn't offer a single detail as to when, where, what, how. He didn't see anything. He didn't say anything. We got nothing on these counts. He does. He says, I never saw her hurt the baby. But he was working full time outside the home. And we have evidence that even when he was in the home, he was sometimes extremely absorbed in his flight training and simulator, for instance, on the day of the death. So there's evidence that he wasn't an extremely attentive parent. And, in fact, that's the reason that he pled guilty to putting his child in a situation that he knew could endanger her safety or her life. Were either of the other two individuals, the grandmother or Pierre, were they smokers? Yes, they were both smokers. There was testimony only that Sophia smoked in the house and that she would smoke when she was intoxicated and that she would leave her cigarettes burning on the bed or the nightstand. The testimony is that the other two smoked in the garage. So certainly a jury could weigh this evidence in a different way. But there was enough evidence for this jury to weigh, especially when they accept, as they must have to reach this verdict, the testimony of Peter Zais. Now, Ms. Zais has also challenged the evidence that she intentionally caused these injuries. The nature of the injuries speaks for itself. This fatal injury, for instance, was so severe that it was comparable to what an infant would receive in a fatal car crash or from being dropped from a third-story window. It's simply not possible that someone can inflict that level of force on an infant without a realization that that force may result in death or serious bodily injury. The other intentional injuries under New Mexico law are the same. The variety of them, the severity of them, the timeline of them supports intentionality here. Even defendant's own experts said that Annalisa was a battered baby. And he explained that as injuries over in multiple places that cannot be accounted for by accidental or natural processes. Galindo recognizes extent and severity as evidence of intentionality, and that's enough to get the jury to intentionality here. It's more than enough. Zais made a brief argument about her motion for severance here that I can briefly respond to. Judge Brack did not fail to do the required balancing. His order denying severance says the ‑‑ I don't have an exact quote, but there's a sentence performing the exact balance he's supposed to under the law, weighing the expense and inconvenience of separate trials against the risk of prejudice, and he finds that that balance does not favor severing here. That is a highly discretionary decision. Ms. Zais has cited no cases in which this court has ever found that a district court abused its discretion in denying severance. And here ‑‑ What is the import of the fact that that count 16 was ultimately dismissed? I don't think that there is any import of it, because Ms. Zais never moved at that point for a mistrial on her severance issue. After count 16 was dismissed, she never again said, you need to revisit severance at this point. She never raised it in a motion for a mistrial, and she never raised it in a motion for a new trial. The only thing that she's raised on appeal is that the district court abused its discretion when it denied her pretrial motion for severance. So I don't think that the court can look now at things that happened afterwards. But even if you look and see what came in for count 16, what came in for count 16 that the jury would not have otherwise heard? And that class of evidence was very limited. It was essentially all of the evidence, and I don't deny it took up a lot of time, about the growth charts and the developmental milestones that Aniyah had not met, but that is essentially the only evidence that would not have come in. All of the stuff about her drinking, her violence, her smoking, that came in for the Annalisa counts too. Well, how much of that would have come in on a timeline? I mean, Annalisa was alive for a very limited period of time. Smoking, drinking, as it relates to that period of time, definitely. Smoking and drinking related to that whole period of time of the older daughter too would have come in? There really actually wasn't a lot of testimony about when this smoking and violence, et cetera, occurred. And so I don't believe that the jury got the idea that it went on, you know, for years, but otherwise they only would have known that it went on for months. There wasn't a lot of specific testimony about that. Even evidence of the unclean house would have come in for the Annalisa accounts too, because it gives you an idea of what the chaotic atmosphere in this house was like at the time. He lived there too. Mr. Zayas lived there too. Of course he did. And he has been held responsible for his part in this. The government's theory was not that the mom is always the guilty one. The mom is the one that's responsible for keeping up the house. But the state of the house does show that these folks were barely holding it together. Those are conditions right for child abuse. And it shows at least a reckless disregard for the safety of the children that were living there in those conditions. It's not a matter of it's her because she's the woman. The government prosecuted both of the Zayases, and Sophia Zayas was only defendant on trial. Well, you added, as I recall, you didn't even add count 16 about the other daughter, the abuse of the other daughter until immediately before trial, right? No, I don't believe that that's true. That was in one of the early versions of the indictment. When was that? I would have to look back at the record, Your Honor. But I had the belief that that was added. That was in one of the early, early versions, right, before the first appeal. I will go back and check. Because this happened in 2007, and the trial wasn't until 2020, right? 21. The second, yeah. The second. After we remanded, and then there was a trial. 2021, so it was 14 years later. I was just wondering when that count 16 was added with a separate indictment, wasn't it? It wasn't a last-minute decision. It wasn't? Okay. I think it was before the appeal. If I'm incorrect, I will go back and check and let you know. Okay. But I know that that was a last-minute decision. But we also know that right before this second trial, the government offered a plea deal of basically probation for her and a charge to lying to a federal agent, right, that she didn't accept? That's right. She didn't accept that. This is right before. It was not right before trial. I'll tell you what's different, what's significant about that timeline. Plea negotiations closed in April. That's in the record. Peter Zayas came forward and told the government that he had lied in, I believe, June or July. I know it was June or July. It was one of his pretrial interviews, which of the two? This is 14 years now after the event, right? Yes, it is. And so in April, I think you can understand why the government, without having the testimony of Peter Zayas, would say we've got to get what we can out of this. We've salvaged something. We don't have Peter. But when Peter was on board, it changed the calculus. And it's not like the government made the decision to subject her. I'm sorry, I see that I'm out of time. May I briefly wrap up? Please. The government stood by the charges it had always brought. The government didn't bring a mandatory minimum charge in response to her rejecting the plea offer or in response to her taking this appeal. She decided to go forward on her original charges. I can't speak to what she did. Well, I'm just trying to isolate on 16 why you might have added that charge when you did and it seemed so distinct from the rest, the child endangerment type of. No, I believe that that charge was present in the earlier versions of the indictment. Thank you. Nothing further. Thank you. Thank you. Two minutes, please. Thank you, Your Honors. I appreciate it. Just to answer your question, Judge Moritz, it was part of the very early indictments. There was a motion for bill of particulars early on. To add the second, the abuse of the second child. Yes, the count 16. Thank you. Yes, there was. The defense, even before I was involved in the case, other defense lawyers had already said, we don't understand what's being charged in this count. That was a theme throughout, Your Honor. I wanted to talk just for a minute about the violence of Sophia Zayas. The testimony actually is very clear that she was only violent, not just only when she was drunk, but only when he tried to take her alcohol away from her. So Peter Zayas limited it to very limited circumstances. He said there was no other instances of violence that he ever saw, except when she was drunk and he tried to take her alcohol away. Now, here's something about the day of Annalisa's death. The testimony is clear. Ms. Zayas was not drinking that day. She was not drunk that day. She had been drunk the week before. And that's not only from Mr. Zayas, but it's from investigators that saw her at the hospital. There was no odor of alcohol, no indicia of drinking that day. So there's no reason to believe that she was violent on that day. So there's no evidence, there are three adults in the house, no evidence that the baby was in Ms. Zayas' sight the entire time. She is the primary caretaker. No evidence that she's in her sight the entire day. Is that kind of evidence really required?  So in most of these cases where it's inference upon inference, and I would say there's just one too many inferences here, but you can infer when there's one person in the house, it's sort of a reciprocal type of situation, there's an injury and there's only one person there, that person must have done that. We have three people here, and there's no evidence that she has any intent to hurt her baby in her prior conduct. I know my time is up. I appreciate the extra time, Your Honor. The case is submitted. Thank you, counsel.